UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

Eastern District of Kentucky
FILED
MAR 02 2023
AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

UNITED STATES OF AMERICA

V.  INDICTMENT NO. 5:23-CR-24-KKC-EBA

AMR MOHAMED

* * * * *

**THE GRAND JURY CHARGES:**

## Background

1. At all relevant times, **AMR MOHAMED** was a licensed physician, with a specialty in nephrology, residing and practicing in Lexington, Kentucky, in the Eastern District of Kentucky.

2. **AMR MOHAMED** practiced at and was employed by the health care system of a public university ("University A"). In the course of his employment at University A, **AMR MOHAMED** was required to disclose any remuneration from any entity outside of University A.

3. In addition to his practice at University A, **AMR MOHAMED** worked for various telemedicine companies that arranged for physicians and other medical professionals to prescribe a variety of durable medical equipment, topical creams, and genetic testing for Medicare beneficiaries. At no time did **AMR MOHAMED** disclose the remuneration he received from these telemedicine companies to University A.

## The Medicare Program

4. The Medicare Program ("Medicare") provided benefits to persons who were over the age of sixty-five or disabled. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "federal health care program," as defined by 42 U.S.C. § 1320a-7(b)(f).

5. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries," and as beneficiaries, they were eligible to receive a variety of goods and services.

6. Medicare provided coverage to beneficiaries for medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers (collectively, "providers"), including genetic testing, and office services and outpatient care, including the ordering of durable medical equipment and braces ("DME"), provided that all the services and DME were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

7. Providers that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." Upon enrollment, providers were permitted to provide medical services and items to beneficiaries and members, and subsequently submit claims, either electronically or in hardcopy, to Medicare, through fiscal intermediaries, seeking reimbursement for the cost of services and items provided.

8. To receive Medicare reimbursement, providers had to apply for and execute a written provider agreement, known as CMS Form 855. The Medicare application was required to be signed by the provider or an authorized representative of the provider. The

application contained certifications that the provider agreed to abide by the Medicare laws and regulations, including the Federal Anti-Kickback Statute, and that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

9. Medicare reimbursed claims submitted by providers if the services and items provided were medically necessary for the diagnoses and treatment of beneficiaries and members. Conversely, Medicare did not cover and would not reimburse claims for services and items that were not medically necessary. Medicare claim forms required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."

## Telemedicine

10. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology to interact with a patient. Legitimate telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Legitimate telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, legitimate telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

11. During the timeframe of the conspiracy described below, Medicare covered expenses for specified telemedicine services if certain requirements were met. These requirements included, but were not limited to: (a) the beneficiary was located in a rural

or health professional shortage area; (b) services were delivered via a two-way, real-time interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telemedicine consultation with a remote practitioner.

### Durable Medical Equipment

12. Medicare covered a beneficiary's access to DME and braces, such as off-the-shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician.

13. For certain DME products, Medicare promulgated additional requirements that a DME order must meet for an order to be considered "reasonable and necessary." For example, for OTS knee braces billed to Medicare under the Healthcare Common Procedures Coding System ("HCPCS") Codes L1833 and L1851, an order would be deemed "not reasonable and necessary," and reimbursement would be denied unless the ordering/referring physician documented the beneficiary's knee instability by examination of the member and objective description of joint laxity.

### Topical Creams

14. Medicare Part D provided prescription drug benefits and helped Medicare beneficiaries pay for prescription drugs. Topical creams and ointments were covered by certain beneficiaries' Medicare Part D plans. Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their

Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

15.  Medicare required of its providers, among other things, that all drugs prescribed or issued be medically necessary, that is, "reasonable and necessary" for the diagnosis and treatment of an illness or injury. For a drug to have been covered and reimbursable under Medicare, the drug must have been prescribed by a physician who was treating the beneficiary within the scope of the physician's license, must have been required to diagnose or treat the beneficiary's medical condition, and must have been safe and effective.

Genetic Testing

16.  Genetic tests were medical laboratory procedures using molecular pathology to test for a patient's genetic predisposition to cancer and other diseases. Genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers or other diseases in the future. Genetic testing was not a method of diagnosing whether an individual presently had cancer or other diseases.

17.  Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than

treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(l). Among the exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

18.  If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Regulations provided: "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

19.  Because genetic testing did not diagnose cancer or other diseases, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover genetic testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## COUNT 1
### The Kickback Conspiracy
### 18 U.S.C. § 371

20. Paragraphs 1 through 19 are re-alleged and incorporated by reference as though fully set forth herein.

21. From in or around March 2018, and continuing through in or around April 2019, the exact dates being unknown to the grand jury, in the Eastern District of Kentucky, and elsewhere,

**AMR MOHAMED**

knowingly and willfully conspired and agreed with other persons both known and unknown to the grand jury to violate the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), by knowingly and willfully soliciting and receiving remuneration in return for referring individuals to a person for the furnishing or arranging for the furnishing of items and services for which payment was made in whole or in part under a Federal health care program, to wit, the Medicare program.

Manner and Means of the Conspiracy

22. It was part of the conspiracy that **AMR MOHAMED** agreed with telemedicine company RediDoc L.L.C. ("RediDoc") to provide contracted physician telemedicine services to Medicare beneficiaries. Pursuant to the agreement with RediDoc, **AMR MOHAMED** ordered medically unnecessary DME, topical creams, and genetic testing for thousands of Medicare beneficiaries, for which he received, on average, $20 per beneficiary from RediDoc. The DME, topical creams, and genetic testing were medically unnecessary because **AMR MOHAMED** (i) was not the treating

physician of any of the beneficiaries, (ii) did not have a bona fide physician-patient relationship with the beneficiaries, (iii) did not use the results of the testing in the treatment of the beneficiaries, (iv) did not make a meaningful or reasonable diagnosis of medical necessity using independent medical judgment, and (v) because he was being paid a kickback for each beneficiary.

## Overt Acts

23. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Kentucky, and elsewhere:

  a. Between in or about March 2018 and April 2019, **AMR MOHAMED** referred and ordered medically unnecessary DME, topical creams, and genetic testing to be billed to Medicare for more than seven thousand beneficiaries.

  b. For each of these beneficiaries, **AMR MOHAMED** solicited and received a kickback in the form of monetary remuneration in return for ordering the test or other service. Between in or about March 2018 and April 2019, **AMR MOHAMED** received $261,054 in kickbacks from RediDoc for the ordering of DME, topical creams, or genetic testing for Medicare beneficiaries.

  c. On or about July 2, 2018, patient C.T., a resident of the Eastern District of Kentucky, received an unsolicited phone call informing her that she qualified for a program providing free medical braces.

C.T. informed the caller she could not wear braces due to a skin condition and informed the caller not to send braces. On or about July 2, 2018, **AMR MOHAMED** ordered medical braces for patient C.T., causing Medicare to be billed $1,695.29. **AMR MOHAMED** received $20 from RediDoc for this order.

d. On or about March 27, 2019, patient S.E., a resident of the Western District of Kentucky who suffers from dementia, received an unsolicited phone call regarding free medical braces. A family member of S.E. informed the caller S.E. did not want or need braces. On or about March 27, 2019, **AMR MOHAMED** ordered medical braces for patient S.E., causing Medicare to be billed $3,650.85. **AMR MOHAMED** received $20 from RediDoc for this order.

All in violation of 18 U.S.C. § 371.

## COUNT 2
### The Health Care Fraud Conspiracy
### 18 U.S.C. § 1347

24. Paragraphs 1 through 19 are re-alleged and incorporated by reference as though fully set forth herein.

25. From in or around March 2018, and continuing through in or around July 2022, the exact dates being unknown to the Grand Jury, in the Eastern District of Kentucky, and elsewhere,

**AMR MOHAMED**

knowingly and willfully combined, conspired, confederated, and agreed with persons known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, or services, in violation of Title 18, United States Code, Section 1347.

## The Purpose of the Conspiracy

26.     The purpose of the conspiracy was for **AMR MOHAMED** and his coconspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for signed doctors' orders and prescriptions for DME, topical creams, and genetic testing, that were not legitimately prescribed, not needed, not used, or induced through unlawful kickbacks and bribes; and (b) submitting and causing the submission of false and fraudulent claims to Medicare for DME, topical creams, and genetic testing that were not medically necessary and not eligible for reimbursement.

## The Manner and Means of the Conspiracy

27.     The manner and means by which **AMR MOHAMED** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

a. **AMR MOHAMED** falsely certified to Medicare that he would abide by all Medicare rules and regulations and federal laws, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that he would comply with the Federal Anti-Kickback Statute.

b. **AMR MOHAMED** worked for multiple telemedicine companies and signed doctors' orders and prescriptions for DME, topical creams, and genetic testing that were used to submit false and fraudulent claims to Medicare.

c. **AMR MOHAMED** electronically signed doctors' orders and prescriptions for DME, topical creams, and genetic testing for Medicare beneficiaries based on only a brief telephonic conversation, or no conversation at all, and without establishing a doctor-patient relationship, without seeing or physically examining the beneficiaries, and without regard for medical necessity.

d. In signing the doctors' orders and prescriptions for DME, **AMR MOHAMED** falsely certified that he completed a consultation and that the treatment he ordered or prescribed was medically necessary.

e. In signing doctors' orders and prescriptions for topical creams, **AMR MOHAMED** falsely certified that the prescriptions were written based on a valid patient/doctor relationship in the normal course of his practice.

    f. In signing doctors' orders for genetic testing, **AMR MOHAMED** falsely certified that the testing was medically necessary for the diagnosis or detection of a disease, illness, impairment, syndrome, or disorder and that the results would be used in the medical management and treatment decisions for the patient.

    g. Telemedicine companies paid **AMR MOHAMED** a fee per "visit," constituting illegal kickbacks and bribes in exchange for signing doctors' orders and prescriptions.

28. Between in or around March 2018 and July 2022, **AMR MOHAMED** and his co-conspirators caused the submission of false and fraudulent claims to Medicare in excess of $28 million for DME, topical creams, and genetic testing that were not legitimately ordered or prescribed, not medically necessary, not used, and induced through unlawful kickbacks and bribes.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE ALLEGATIONS
## 18 U.S.C. § 982(a)(7)

29. By virtue of the commission of the offenses alleged in this Indictment, the defendant **AMR MOHAMED**, shall forfeit to the United States all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses. Any and all interest that **AMR MOHAMED** has in this property is vested in and forfeited to the United States pursuant to 18 U.S.C. § 982(a)(7).

30. The property to be forfeited includes, but is not limited to, the following:

   **MONEY JUDGMENT:**
   A forfeiture money judgment in an amount representing the gross proceeds in aggregate obtained by the defendant as a result of the violations alleged in the Indictment.

31. If any of the property listed above, as a result of any act or omission of the Defendant, (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty, the United States shall be entitled to forfeit substitute property pursuant to 21 U.S.C. § 853(p).

**A TRUE BILL**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
FOREPERSON

_____
**CARLTON S. SHIER, IV**
**UNITED STATES ATTORNEY**

## PENALTIES

**COUNT 1:** Not more than 5 years imprisonment, a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss, and supervised release of not more than 3 years.

**COUNT 2:** Not more than 10 years imprisonment, a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss, and supervised release of not more than 3 years.

**PLUS:** Mandatory special assessment of $100 per count.

**PLUS:** Restitution, if applicable.

**PLUS:** Forfeiture, as alleged.